UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **WILLIAM L. JOHNSON,** *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No. 3:07-0979** |
| | ) | **Judge Trauger** |
| v. | ) | |
| | ) | |
| **THE METROPOLITAN GOVERNMENT** | ) | |
| **OF NASHVILLE AND DAVIDSON COUNTY,** | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**Consolidated with:**

| | | |
|---|---|---|
| **KEITH M. HOLLEY,** | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 3:08-0031** |
| | ) | **Judge Trauger** |
| v. | ) | |
| | ) | |
| **THE METROPOLITAN GOVERNMENT** | ) | |
| **OF NASHVILLE AND DAVIDSON COUNTY,** | ) | |
| *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the court are the objections of plaintiffs William L. Johnson, Julian W. Moore, and Keith M. Holley (Docket Nos. 137 and 138) to two orders entered by Magistrate Judge Bryant in this case (Docket Nos. 129 and 130).[1] The first order grants non-party Michael Allen's Motion to Quash Subpoena (Docket No. 88), and the second order likewise grants non-

---

[1] The plaintiffs' Motion to Compel is pending before Judge Bryant. (See Docket Nos. 135-136.)

1

party *The Tennessean*'s Motion to Quash and for Protective Order (Docket No. 90). For the reasons discussed herein, the court finds that Judge Bryant's rulings are not clearly erroneous or contrary to law and, therefore, the court will overrule the plaintiffs' objections.

## **RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

The plaintiffs are police officers employed by the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro").[2] The plaintiffs allege that they were wrongfully denied promotion from the rank of sergeant to the rank of lieutenant by the Metropolitan Nashville Police Department (MNPD) due to illegal employment discrimination. In particular, the plaintiffs allege that the MNPD promoted African-American and female candidates in lieu of the plaintiffs (who are white males) without regard to objective test results and evaluation. The plaintiffs brought this case asserting that, under various state and federal statutory provisions, they were discriminated against on the basis of race and gender.

As indicated above, the matter before the court involves whether the plaintiffs have the right to take the depositions of two non-parties. The first deposition concerns Michael Allen who has, at all relevant times, been a member of the Metropolitan Civil Service Commission (MCSC). The MCSC is part of the executive branch of Metro, and the individual commission members are appointed by the Mayor. Among its many duties, the MCSC reviews, approves, revises, and modifies actions taken by Metro's Director of Personnel.

In April 2006, a proposed revision to Metro's civil service policy governing promotions within the MNPD was before the MCSC. These revisions had been jointly proposed by Metro's Human Resources Department, an outside research firm, and the MNPD. The MCSC voted

---

[2] The undisputed facts are drawn from Judge Bryant's orders (Docket Nos. 129 and 130).

2

three-to-one in favor of approving the proposed revisions, with Mr. Allen casting the sole vote against.

The plaintiffs contend that these revisions allowed Metro additional leeway to rely upon subjective criteria when making promotional decisions within the MNPD. Specifically, the plaintiffs allege that the new policy allowed Metro the leeway to make promotional decisions on the basis of race and gender, that is, to promote minorities and women over more qualified non-minorities and males. In September 2006, several months after the approval of the revised promotion policy by the MCSC, the MNPD announced the promotions that gave rise to the plaintiffs' claims. There is no allegation that the MCSC or Mr. Allen participated in making the promotional decisions about which the plaintiffs complain.

The second deposition concerns Christian Bottorff, a newspaper reporter employed by *The Tennessean*, which is a daily newspaper of general circulation in Nashville and Middle Tennessee. On April 2, 2007, Mr. Bottorff wrote an article in *The Tennessean*, which, in general, discussed the opinions of various members of the community regarding the new MNPD promotions policy. Included in this article were several statements from MNPD spokesman Don Aaron espousing the benefits of "diversity" within the MNPD.

During discovery in this case, the plaintiffs served subpoenas to take the depositions of Messrs. Allen and Bottorff; motions to quash those subpoenas have been filed. Mr. Bottorff's subpoena requested that he bring to the deposition "all records" relating to the April 2, 2007 article. His employer, *The Tennessean*, filed a motion on his behalf, seeking to quash the subpoena and seeking a protective order that the deposition not be taken. After the motions were referred to Magistrate Judge Bryant and fully briefed, Judge Bryant issued orders granting both

3

motions to quash.  The plaintiffs have filed objections to Judge Bryant's orders.

## ANALYSIS

I. **Standard of Review**

The plaintiffs have filed timely objections to the Magistrate Judge's orders.  Pursuant to 28 U.S.C. § 636(b), a district court shall apply a "clearly erroneous or contrary to law" standard of review to a magistrate judge's ruling on "nondispositive" preliminary matters such as discovery motions.  28 U.S.C. § 636(b); *Sims v. First Horizon National Corp.*, 2009 WL 1789090, *3 (W.D. Tenn. June 23, 2009).  Also, under Fed. R. Civ. P. 72(a), a district judge shall consider objections to a magistrate judge's order on a non-dispositive matter and "shall modify or set aside any part of the order that is clearly erroneous or contrary to law."  *Id;* Fed. R. Civ. P. 72(a).  With this standard in mind, the court will consider each set of objections in turn.

II. **Mr. Allen's Motion to Quash**

As fully explained in Judge Bryant's Memorandum and Order, the plaintiffs seek to question Mr. Allen at deposition on ten topics, all of which relate to the purpose, procedures, and justifications behind the new promotional policy approved by the MCSC in April 2006.  (Docket No. 129 at 3-4.)  Mr. Allen objected to being deposed on these topics, arguing that his testimony is privileged under the doctrine alternatively known as the "deliberative process," "legislative," or "mental process" privilege.  (See Docket No. 88 at 3.)

As discussed in Judge Bryant's Memorandum and Order, the Supreme Court has recognized that legislators are "absolutely immune from liability for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 48 (1998).  This privilege extends to state, regional, and

4

local legislators. *Id.* at 49. Further, this absolute legislative immunity "attaches to all actions taken in the sphere of legitimate legislative activity." *Id.* at 54 (internal quotation omitted). Therefore, even if a government official is not a "legislator," he enjoys immunity for his actions that may be objectively considered "legislative," as opposed to being "administrative" or "ministerial." *Id.* at 55. Actions such as voting for or against an ordinance of general applicability are "quintessentially legislative." *Id.* Further, immunity attaches for conduct that is "integral" to the legislative process, such as introducing a bill or conducting fact-finding for a piece of legislation and other acts "generally done in the course of the process of enacting legislation." *Id; Government of Virgin Islands v. Lee*, 775 F.2d 514, 520 (3rd Cir. 1985).

While this issue has not been thoroughly explored by the Sixth Circuit, it is clear that legislative immunity protects not only against civil liability, but "it also functions as an evidentiary and testimonial privilege." *Miles-Un-Ltd., Inc. v. Town of New Shoreham*, 917 F. Supp. 91, 98 (D.N.H. 1998); *see also Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 297-98 (D. Md 1992); *Cunningham v. Chapel Hill, ISD*, 438 F. Supp. 2d 718, 723 (E.D. Tex. 2006)("the testimonial privilege is an inherent aspect of the legislative immunity that applies to local legislators ... . The vote taken ... was a legislative act. Accordingly, the doctrine of legislative immunity protects [all] trustees from having to testify with regard to actions taken in the sphere of legitimate legislative activity ... ."); *Williams v. Johnson*, 597 F. Supp. 2d 107, 115 (D.D.C. 2009)("Legislative immunity ... affords protection not only when a legislator is named a defendant in a lawsuit but also when a litigant wishes to obtain discovery from a legislator as a third-party witness.")

In light of this case law, it seems clear that Mr. Allen may properly invoke legislative

5

immunity to protect himself from having to give a deposition concerning the adoption of the new promotional policy. Mr. Allen's vote on the policy was a "quintessentially legislative" act, and the immunity doctrine discussed above would protect him from having to testify about that act and other acts "generally done in the course of the process of enacting legislation." *Lee*, 775 F.2d at 520. Indeed, this is precisely the conclusion reached by Judge Bryant in his Order.

In their objections, the plaintiffs do not offer any additional substantive argument from their initial briefing. Rather, as they did in their briefing before Judge Bryant, the plaintiffs argue that (1) Allen waived the privilege by speaking to members of the press about the adoption of the promotion policy; (2) that the MCSC is not a legislative body; and (3) the privilege does not extend to cases in which the "intent" of the government is at issue. (Docket No. 137 at 6-16.)

Judge Bryant's conclusion that none of these arguments have merit was certainly not contrary to law or clearly erroneous. First, the cases cited by the plaintiffs for the proposition that the legislative privilege can be waived involve a situation in which the party asserting the privilege had already testified in a deposition or other proceeding about the legislative act. *See e.g. Alexander v. Holden*, 66 F.3d 62, 68; *Lee*, 775 F.2d at 520; *Schaefer*, 144 F.R.D. at 298. The plaintiffs came forth with no case law indicating that the privilege can be waived simply by commenting about the legislative process to members of the press.[3] Indeed, finding waiver in

---

[3] The plaintiffs focus on two statements Mr. Allen made to the press. First, in April 2006, he told a writer from *The Tennessean* that the new promotions policy was not "the best way" to do promotions because it would leave too much "discretion" within the MNPD. (Docket No. 137 at 7.) In May 2007, he told a writer from the *Nashville Scene* that the policy could result in apparent "reverse discrimination," stating, "[t]hat's why I voted against it. If Johnson was higher on the list and didn't get promoted, I don't think it was fair. But I lost that vote and the policy was adopted, and the way that policy works, he's been treated fairly. There

6

such instances seems potentially unwise, as it could chill contact between legislators and the press. Therefore, as Judge Bryant concluded, the plaintiffs' waiver argument is without merit.

The merits of the plaintiffs' second argument, that the MCSC is not a legislative body, have been, in large part, addressed above. When evaluating whether there is a claim for legislative immunity, courts are to evaluate the "function" performed by the individual claiming the privilege, that is, whether the function performed was "legislative" or "administrative," not whether the entity in which the individual was operating was necessarily solely a legislative body. *Bogan*, 523 U.S. at 54-55. Therefore, government officials outside of the legislative branch still enjoy legislative immunity for legislative functions. *Id.* Here, the function performed by Mr. Allen was to vote on a generally applicable promotion policy for municipal employees, which is clearly a legislative function. *Id.* The other functions that are performed by the MCSC are simply not relevant to the present question before the court. Therefore, as Judge Bryant found, this second objection is without merit as well.

Finally, the plaintiffs argue that this privilege does not extend to cases, such as this one, in which the government's intent is at issue; that is, in those cases, the legislative privilege must give way to the plaintiff's interest in preventing government misconduct. (Docket No. 137 at 13.) The cases cited by the plaintiffs, however, only indicate that legislative immunity for government officials may give way when the plaintiff claims that the government official asserting the privilege engaged in misconduct. *See e.g. U.S. v. Lake County Bd. of Commissioners*, 233 F.R.D. 523, 526 (N.D. Ill. 2005); *North Pacifica, LLC, v. City of Pacifica*, 274 F. Supp. 2d 1118, 1122 (N.D. Cal 2003). Here, there is no allegation that Mr. Allen

---

is some reason that Chief Serpas is looking over him." (See Docket No. 144 at 8.)

7

committed any wrongdoing or had any discriminatory intent, and, therefore, as Judge Bryant found, his legislative immunity is not lost simply because the plaintiffs happen to allege misconduct by other government officials.

In short, the plaintiffs have done little to cast doubt on the logic of Judge Bryant's opinion.[4] Judge Bryant's conclusions were not contrary to law or clearly erroneous, and,

---

[4]The plaintiffs contend that, even if some privilege applies, there are certain topics, among the ten requested, that would still fall outside of the privilege. (Docket No. 137 at 7, 12.) By way of review, the plaintiffs sought to take Mr. Allen's deposition "on the following areas: 1) any statements made to him, from him or which he overheard from Chief Serpas or any other upper ranking officer or supervisor at the police department that this promotional system was being adopted so that minorities could be promoted over the white and/or majority officers; 2) any statements which he made, he overheard or was made to him with regard to why this new promotional policy was enacted in 2006; 3) why [the outside consultant] was hired by the Defendant and the recommendations made to the defendant by [the consultant.]; 4) his internal thought processes with regard to this new promotional policy; (5) questions with regard to statements made by [Allen] after the adoption of the policy to the press about the adoption of the policy and his subjective thoughts about whether the system adopted was fair based on race; (6) whether an anonymous survey was a part of the promotional policy adopted by the Defendant; (7) whether the policy required all promotional testing and evaluation materials to be saved; (8) what was the past history of the defendant with regard to promoting minority candidates in the police department; (9) what was the defendant's and [Allen's] reaction to [a report critical of the defendant's old promotional process] and what steps, if any, were taken in response ... ; (10) what was the racial data used to justify the new promotional process." (Docket No. 95 at 3-4.) To the court, all of these areas of questioning implicate "acts generally done in the course of the process of enacting legislation," such as fact-finding, investigating, and deliberating over the meaning of legislation, and are, therefore, protected areas under the legislative privilege at issue here. *See e.g. Lee*, 775 F.2d at 520. To the extent any of these ten items might arguably implicate material or testimony outside of the legislative privilege, it must be recalled that Mr. Allen is of interest to the plaintiffs primarily because of his role in voting on the policy (a clear area of legislative privilege) and that the privilege exists, in large part, to prevent "intrusion" into the life of the government official. *Williams*, 597 F. Supp. 2d at 115. Further, as Judge Bryant correctly concluded, any material on this list that might be arguably outside of the legislative privilege is also "readily obtainable from reading the promotion policy itself [or] readily obtainable directly from other available sources [or] irrelevant" given the facts and claims in this case. (Docket No. 129 at 12.)

8

therefore, his Order quashing the subpoena of Mr. Allen should stand.[5]

## II. *The Tennessean*'s Motion to Quash and for Protective Order

Judge Bryant also found that *The Tennessean*'s motion to quash the subpoena seeking the testimony of their reporter, Christian Bottorff, should be granted, and a protective order should be entered precluding the deposition. (Docket No. 130.) As noted above, the plaintiffs' interest in Mr. Bottorff stems from an April 2, 2007 article Mr. Bottorff wrote in which MNPD spokesman Don Aaron made statements about the new promotions policy. The quote of primary concern to the plaintiffs is Mr. Aaron's remark that, "[i]f you have two candidates who are essentially equal and believe that both would make very good supervisors, and if your choice is to make the department more diverse, you would probably elect to include diversity in your choice."[6] (See Docket No. 138 at 3.)

The plaintiffs have taken Mr. Aaron's deposition and have asked him about the statement, but they now claim that they need further information from the individual (Mr. Bottorff) to whom Mr. Aaron made the statement. Specifically, as Judge Bryant noted, the plaintiffs seek to take Mr. Bottorff's deposition to determine "whether the statement attributed to Don Aaron was true and accurate and did Don Aaron make that statement. Further, plaintiffs

---

[5] Because of the findings above, it is not necessary for the court to address Mr. Allen's alternative argument (also embraced by Judge Bryant) that the material sought from Mr. Allen is irrelevant in light of this court's previous dismissal of the plaintiffs' disparate impact claim. (Docket No. 129 at 11.)

[6] The plaintiffs note that Mr. Aaron made a similar comment to another writer for *The Tennessean* on October 10, 2006, when he stated, "[t]he goal of this police department is to mirror the population of the city to the greatest extent possible. When presented with the opportunity to promote bright, qualified minority candidates, you always give those persons consideration." (Docket No. 138 at 3.)

9

seek information as to the context of the word 'diversity' as used in this article." (Docket No. 130 at 3.)

Judge Bryant correctly determined that the Sixth Circuit has not recognized a general "news reporter's privilege" in civil cases. (Docket No. 130 at 4, citing *In re Grand Jury Proceedings*, 810 F.2d 580, 586 (6th Cir.1987)). That said, the Sixth Circuit has instructed lower courts to "make certain that the proper balance is struck between freedom of the press and the obligation of all citizens to give relevant testimony." *Id.* That is, courts must ensure that proper deference is given to the unique role played by journalists in our society and also must ensure that private parties are not allowed to turn non-party journalists and newspapers into "private discovery agents." *In re DaimlerChrysler AG Securities Litigation*, 216 F.R.D. 395, 406 (E.D. Mich 2003).

In light of this, Judge Bryant concluded that the appropriate test for determining whether *The Tennessean*'s motion should be granted is the balancing test performed whenever a protective order is sought under Rule 26(c) of the Federal Rules of Civil Procedure. (Docket No. 130 at 5; Fed. R. Civ. P 26(c)). Rule 26(c) provides that the court may, for "good cause ... issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" and that order may forbid discovery into certain areas. Fed. R. Civ. P. 26(c).

Judge Bryant then went on to consider the factors (identified in Rule 26(b)(2)) that are to be considered by the court in limiting the frequency or extent of discovery in a particular case; that is (1) whether the discovery sought "can be obtained from some other source that is more convenient, less burdensome or less expensive"; (2) whether the party seeking the discovery "has had ample opportunity to obtain the information by discovery in the action" and (3) whether "the

10

burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2).

Judge Bryant considered all three issues. First, as to the availability of the information from other sources, Judge Bryant aptly noted, "given that plaintiffs are seeking discovery from Mr. Bottorff indicating 'whether the statement [in the April 2, 2007 article] attributed to Don Aaron was true and accurate and did Don Aaron make that statement' and 'information as to the context of the word 'diversity' as used in the article,' a logical alternative source for this information is Mr. Aaron himself." (Docket No. 130 at 6.) Judge Bryant pointed out that the plaintiffs had deposed Mr. Aaron, and, therefore, had the opportunity to fully investigate whether Mr. Aaron made the statement and to explore the "context" of the word "diversity," along with any other issues surrounding the statement. (*Id.*)

Second, Judge Bryant concluded that the availability of Mr. Aaron also indicated that there was ample and "adequate opportunity to obtain discovery" on the accuracy of the quotation, the meaning of "diversity," and similar issues. (*Id.* at 7.) Finally, Judge Bryant concluded that, while the burden to Mr. Bottorff and *The Tennessean* in this isolated instance was fairly light (given that the plaintiffs only seek a single deposition), "the collective burden on news reporters and their employers if they were routinely called upon to produce their investigative files regarding matters in litigation would be considerable, and would jeopardize their ability to perform the valuable public function of gathering and reporting the news." (Docket No. 130 at 8.) Also, Judge Bryant concluded that the value of the discovery to the

11

plaintiffs was slight, given that Mr. Aaron did not participate in any of the personnel decisions at issue in this case and Mr. Aaron's somewhat vague, general statements about the policy have little bearing on the specific promotional decisions at issue here. (Docket No. 130 at 8.) Weighing all of these factors, Judge Bryant granted *The Tennessean*'s motion to quash and for protective order.

In objecting to Judge Bryant's Order, the plaintiffs argue that Mr. Aaron was not a reliable source of information about the statement (and did not provide an "ample" opportunity for discovery about the statement) because, at his deposition, he was evasive and because, despite the "obvious context" of the April 2, 2007 interview, he claimed that "diversity" did not simply mean "racial diversity" but rather all "differences between people." (Docket No. 138 at 5.) Other than this, the plaintiffs spend the remainder of their brief emphasizing the importance of Mr. Aaron's statement for purposes of their reverse discrimination lawsuit, because it is allegedly evidence of "racial animus" from "the lips of the defendant." (*Id.* at 9.)

Judge Bryant's analysis of this issue was not clearly erroneous or contrary to law. As is made clear from his deposition transcript, while Mr. Aaron did not fully recall the details of the particular interview that resulted in the April 2, 2007 article, he was hardly as evasive as the plaintiffs claim. Mr. Aaron did not deny making the statement at issue, and, indeed, Mr. Aaron stated that he "suspect[ed]" that he made the statement or said something to similar effect, and he certainly never claimed that he was misquoted. (Docket No. 110 Ex. 2 at 51.) Further, Mr. Aaron readily recognized that increasing diversity might mean, among other things, increasing racial diversity. (*Id.* at 53-55.) Therefore, the court concludes that Judge Bryant was correct that the discovery surrounding Mr. Aaron's statement could be obtained in a "more convenient,

12

less burdensome or less expensive" way than by deposing Mr. Bottorff, and, further, the plaintiffs had "ample opportunity" to obtain the meaning of this statement.

Finally, as to the balancing of the benefits and the burdens of allowing this testimony, the court again agrees with Judge Bryant that the burdens on the deponent outweigh any benefit here. Certainly, there are circumstances in which it is entirely appropriate to compel a reporter or journalist to testify about his or her recollections and observations from an interview. The primary case on which the plaintiffs rely, *NLRB v. Mortensen*, provides such a circumstance. 701 F. Supp. 244 (D.D.C. 1988). That case involved a well-publicized labor dispute, and three journalists had written articles attributing certain statements to certain individuals on the Management Council, which was a central player in the labor dispute. *Id.* at 245. The council members denied making the statements. *Id.* The court compelled the reporters to testify as to whether the statements they attributed had, in fact, been made. *Id.* at 250. There are two major distinctions between this case and *Mortensen*: (1) the individual here, Mr. Aaron, has not denied making the statements at issue and (2) Mr. Aaron was not a key decision maker in this case, as there is no allegation that he played any role in the specific, allegedly discriminatory promotions at issue here.[7]

Indeed, in light of the fact that there is no dispute that Mr. Aaron made the statement at

---

[7]*Mortensen* arose in a Circuit that recognizes a qualified reporter's privilege; however, the analysis as to whether that privilege must give way to a party's need for information is similar to the Rule 26(b)(2) test discussed above. That is, a "reporters privilege can be overcome by satisfying the following three-part balancing test: First, the movant [seeking to override the privilege] must demonstrate that he has made an effort to obtain the information from other sources. Second, he must demonstrate that the only access to the information sought is through the journalist and her source. Finally, the movant must persuade the court that the information sought is crucial to the claim." *Id.* at 248 (internal citation and quotation omitted).

13

issue, there is, frankly, little about which Mr. Bottorff could helpfully testify. Only Mr. Aaron knows what he meant by the statement, and he testified that, to him, "diversity" simply meant the "differences between people," including racial differences. The plaintiffs obviously do not believe that the general, all-encompassing "differences between people" is what Mr. Aaron meant by "diversity." That said, Mr. Bottorff is not in the position to reasonably know what Mr. Aaron meant by the statement. His testimony about the meaning and context of "diversity" would simply be speculation on his part – speculation based on an interview that occurred more than two years ago.

Mr. Bottorff's status as a journalist, combined with the dubious value of his testimony, makes it particularly inappropriate for this deposition to go forward. While, as Judge Bryant pointed out, the individual burden on Mr. Bottorff and *The Tennessean* is relatively light, the court must guard against setting a precedent that would allow a party in a civil case to hale a journalist into court or to a deposition simply to obtain clarification of a statement. Here, the plaintiff seeks to use Mr. Bottorff to obtain an additional explanation or clarification about a statement of a non-party who had no role in the individual decisions that are at the core of this case, when that statement has already been admitted to and explained by the individual to whom the statement was attributed. Given the policy concerns at issue here, there is simply no reason to allow this deposition to go forward, and, therefore, this court concludes that Judge Bryant's decision on this point should stand.

## CONCLUSION

For the reasons discussed above, the court agrees with the determinations of Magistrate Judge Bryant, and, therefore, the relief provided by Judge Bryant as to Mr. Allen's Motion to Quash (Docket No. 88) and *The Tennessean*'s Motion to Quash and For Protective Order (Docket No. 90) will stand.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

.