IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

WILLIAM L. JOHNSON, et al.,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　　No. 3:07-0979
　　　　　　　　　　　　　　　　　　)　　　Judge Trauger
THE METROPOLITAN GOVERNMENT　)
OF NASHVILLE AND DAVIDSON　　　)　　　CONSOLIDATED WITH:
COUNTY, TENNESSEE, et al.,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)
_____

KEITH M. HOLLEY,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　　No. 3:08-0031
　　　　　　　　　　　　　　　　　　)　　　Judge Trauger
THE METROPOLITAN GOVERNMENT　)
OF NASHVILLE AND DAVIDSON　　　)
COUNTY, TENNESSEE, et al.,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)

**MEMORANDUM**

In these consolidated reverse discrimination cases brought under 42 U.S.C. § 1983, Title

VII, and the Tennessee Human Rights Act ("THRA"), the plaintiffs, William L. Johnson, Julian

W. Moore, and Keith M. Holley, all Caucasian males, allege that the Metropolitan Nashville

Police Department ("MNPD") denied them promotions based on race and gender, and instead

promoted less-qualified African Americans and women. The defendants remaining in the case,

Metropolitan Government of Nashville and Davidson County ("Metro") and former MNPD

Chief of Police, Ronal W. Serpas, filed motions for summary judgment on the plaintiffs'

1

disparate treatment claim.[1]  (Docket Nos. 171 & 174.)  Additionally, the plaintiffs filed a motion

(Docket No. 178) requesting that the court enter default judgment against the defendants or, in

the alternative, that the court draw an adverse inference that the deleted content of certain

anonymous rating surveys completed by members of MNPD management at Chief Serpas'

direction during the promotion process would have been favorable to the plaintiffs' position that

they were subjected to reverse race and gender discrimination.  Because Chief Serpas and Metro

did not save all parts of the anonymous surveys and produce the documentation to the plaintiffs

during discovery, the plaintiffs contend that they are entitled to a sanction for defendants'

spoliation of evidence.  These motions have been fully briefed by the parties.

## FACTUAL BACKGROUND

William Johnson and Julian Moore are MNPD police officers who hold the rank of

sergeant.  Johnson started at MNPD in November 1996, and he was promoted to sergeant in May

2005.  Moore began working for MNPD in June 1995, and he was promoted to sergeant in 2004.

Keith Holley started as a trainee at MNPD in May 2001.  He was promoted to police officer I in

November 2001, and to police officer II in May 2002.  Ronal Serpas joined the MNPD as Chief

of Police in 2004, and he served in that capacity during the time relevant to this suit.  The

Metropolitan Government of Nashville and Davidson County is a governmental entity operating

in Nashville, Tennessee.

---

[1]The court previously granted Metro's motion to dismiss the disparate impact claim
raised in the *Johnson* case.  (No. 07-0979, Docket Nos. 85 & 86.)  A disparate impact claim was
not asserted in *Holley*.  (No. 07-0979, Docket No. 68 at 1 n.1.)
    The court also previously dismissed three defendants from the suit:  MNPD Deputy
Chiefs Steve Anderson, Honey Pike, and Joseph Bishop.  (No. 07-0979, Docket No. 41 (Judge
Trauger); No. 08-0031, Docket Nos. 27 & 28 (Judge Wiseman, prior to consolidation).)

2

The MNPD promotion policy in effect prior to 2006 required a police officer who wished to apply for promotion in rank to take a written civil service examination and participate in an assessment center that was designed to evaluate the officer's skills and leadership ability. The scores achieved on these two testing components were combined into a composite score. All candidates were then ranked according to composite score, from the highest to the lowest. The Chief of Police promoted candidates in the order they appeared on the list; the Chief had no discretion to choose a candidate with a lower score who ranked farther down the list, even if the Chief believed that that candidate was better qualified to assume the management position.

While the linear promotion policy was favored by some, such as the Fraternal Order of Police ("FOP"), the policy also generated substantial controversy. In 2002, MGT of America completed a comprehensive performance audit of the MNPD. The audit report stated that the promotion process did not permit adequate assessment of the candidates' managerial aptitude, nor did the policy take into account the officers' past performance. The report recommended restructuring the promotion process to incorporate identification of the officers' managerial abilities, with significant emphasis on the candidates' past performance.

The following year, during Deborah Faulkner's service as acting Chief of Police, the Nashville news media ran stories reporting on infighting and racial tensions within the MNPD concerning promotions. At issue was whether MNPD's "test-heavy process for promoting officers unfairly impede[d] minorities from moving up the ranks[,]" (Docket No. 191-6 at 4, *Nashville Scene*, Oct. 2, 2003), and whether the promotion process should be changed in an effort to enhance diversity in the MNPD leadership.

On December 12, 2003, Deputy Chief Steve Anderson wrote a memorandum to Chief Faulkner requesting that she immediately promote fifteen officers to the rank of sergeant before the promotion register expired on January 9, 2004. (Docket No. 191-7.) Anderson urged quick action because the promotion policy had an acknowledged adverse impact on minority officers, the promotion register included the names of five minority candidates in the top fifteen positions, and the promotion register then being formulated for 2004 and beyond did not have any minority candidates near the top of the list. Thus, there would not be an opportunity to promote minority candidates in the following two to three years. Chief Faulkner announced the promotion of several officers, including minority officers, shortly thereafter, and the local media questioned the timing of her promotion announcement one day before a citizens review committee was scheduled to interview her for the permanent Chief of Police position. (Docket No. 191-6 at 8, *The Tennessean*, Dec. 19, 2003; Docket No. 191-6 at 12, *Nashville Scene*, Dec. 25, 2003.)

As it turned out, Ronal Serpas, not acting Chief Faulkner, was chosen to lead the MNPD, and he took the reins in 2004. The debate about changing the promotion policy continued. Chief Serpas believed, based on his own professional experience and the findings of the 2002 MGT audit, that the linear promotion method was unworkable because it required promotion solely on the basis of a composite score, without regard to a proper evaluation of the candidate's suitability to assume the duties, responsibilities, and authority of the next highest police rank. (Docket No. 169-1, Serpas Depo. at 35-36.)

Jack Byrd, a Nashville attorney who represented the police officers' union at the time, met on numerous occasions with representatives of the MNPD and Metro's Human Resources Department ("Metro HR") to negotiate changes to the promotion policy. (Docket No. 197-1 ¶

4

3.)  Byrd states that, during the meetings, the Metro and MNPD representatives expressed

concern about the lack of diversity in the MNPD, as well as their view that MNPD should better

reflect the community.[2]  (*Id.*)

In 2006, the Metropolitan Civil Service Commission ("the Commission") changed the

MNPD promotion policy at the recommendation of Chief Serpas and Metro HR.  (Docket No.

169-1, Serpas Depo. at 35.)  The new policy was developed by CWH, a contractor hired by

Metro with the approval of the Commission.  (Docket No. 169-3.)

Under the new policy, police officers interested in applying for promotion to a higher

rank are still required to take a written civil service examination and participate in the

assessment center.  For the lieutenant promotion, the policy assigns a weight of 20% to the

written test and 80% to the assessment center; for the sergeant promotion, the policy assigns a

weight of 30% to the written test and 70% to the assessment center.  As in the past, the

applicant's scores on the written test and the assessment are combined, and all candidates are

ranked according to their composite scores, from the highest to the lowest.

When vacancies occur, the Chief of Police requests an eligibility roster.  For promotions

from the rank of sergeant to lieutenant, the eligibility roster lists the names of the seven (7)

highest-scoring candidates; for promotions from the rank of Police Officer II to sergeant, the

eligibility roster lists the names of the nine (9) highest-scoring candidates.  Significantly, the

---

[2]While the defendants urge the court to ignore Byrd's affidavit as untimely filed and
based on hearsay, the court will overlook plaintiff's tardiness in filing the signed copy of the
affidavit.  Byrd can testify to his own attendance at meetings.  The reported comments of the
Metro and MNPD representatives are admissible statements of a party opponent, Fed.R.Evid.
801(d)(2), and Byrd's lay opinion testimony is also admissible because it is rationally based on
his perception, it is helpful to the determination of a fact in issue, and it is not based on scientific,
technical, or other specialized knowledge.  Fed.R.Evid. 701.

5

eligibility roster places the applicants' names in alphabetical order, and it does not reveal the candidates' composite scores. All of the candidates whose names appear on the eligibility roster are deemed equally qualified for promotion. (Docket No. 169-3, Policy 7.2B-I at 4.)

The Chief of Police has complete discretion to select for promotion any officer whose name appears on the eligibility roster. If one vacancy exists, the Chief certifies one name to the Commission for promotion. If multiple vacancies exist, the Chief may select all candidates for promotion from the initial eligibility roster, or he may request one or more new eligibility rosters. If he requests a new eligibility roster, the Commission removes the names of the applicants who were certified for promotion or who were otherwise removed from consideration for certain permissible reasons under the policy, and then adds to the sliding band the names of the next highest-scoring candidates. In this way, the eligibility roster is always replenished so that there are seven names of eligible candidates for lieutenant vacancies and nine names for sergeant vacancies. (Docket No. 169-1, Serpas Depo. at 92-94, 102.)

A number of vacancies occurred in the ranks of lieutenant and sergeant in 2006 and 2007. Promotion announcements were posted, (Docket Nos.191-12 & 191-13), and the applicants took the written examinations and participated in the assessment centers. Johnson and Moore applied for promotion from sergeant to lieutenant. Holley applied for promotion from police officer II to sergeant.

When Chief Serpas received the initial eligibility roster for the rank of lieutenant, Moore's name appeared among the seven candidates on the list. Moore claims that Commander Rick Lankford asked Moore to attend ComStat meetings because he would soon be promoted to lieutenant based on the rankings. (Docket No. 191-2, Moore Aff. ¶ 6.) Johnson ranked 9th, so

6

his name did not appear on the initial eligibility roster; however, his name was later added to the sliding band as other candidates were selected for promotion and the eligibility roster was replenished.

Promotions to the rank of lieutenant were effective on October 1, 2006, February 16, 2007, and May 8, 2007. Moore and Johnson were not promoted. They claim that sergeants who ranked 7th (Natalie Lokey, female); 11th (Andrea Swisher, female); 15th (Terrance Graves, black male), 16th (William Mackall, black male)[3]; and 19th (Michelle Coon, female) were promoted ahead of them. The sliding band method also enabled Keith Claybrooks, a black male who was originally ranked 22nd, to move into the list of seven candidates for promotion.

Moore and Johnson claim that there is no reason why these officers were promoted over them except for their race or gender. (Docket Nos. 191-2, 191-3, Moore & Johnson Affs. ¶ 8.) The defendants, on the other hand, contend that white males who ranked lower than Moore and Johnson were also selected for promotion ahead of them: Brian P. Johnson (10th), Jason S. Starling (12th), and William J. Watkins (13th). (Docket Nos. 169-7 & 169-12.)

Promotions to the rank of sergeant were effective on February 16, 2007, June 16, 2007, and September 1, 2007. When Chief Serpas received the initial eligibility roster for the rank of sergeant, Holley's name did not appear on the list because he ranked 16th. The first African American officer ranked 10th and the next in line ranked in the 20's. Twenty-five (25) officers were initially promoted to sergeant, and another four (4) were promoted later. (Docket No. 195-1, Holley Aff. ¶ 6.) Holley was sent to a supervisor's class the last week of January 2007. His

_____

[3]Both Moore and Johnson assert that Mackall was promoted while he was under investigation for excessive use of force. (Moore and Johnson Affs. ¶ 8.)

name moved into the sliding band as other candidates were selected for promotion and the band was replenished, but Holley was not promoted. (*Id.*) Holley did not specify if, or how many, African American or female officers were promoted over him.

The defendants contend that eleven (11) white males who ranked lower than Holley were promoted in 2007: Keith A. Stephens (17th), Michael L. Dudley (19th), William M. Denton (20th), Robert K. Smith (21st), Jeffrey S. Bauer (22nd), Scott I. Carter (24th), Robert C. Nielson, Jr. (25th), Jason D. Proctor (28th), Robert W. Skinner (34th), and Daniel P. Schager (35th). Additionally, a white female, Jill R. Weaver (27th), who ranked below Holley and above three of the white males who were promoted, was not promoted. (Docket Nos. 169-10 and 169-13.)

The plaintiffs claim that Chief Serpas and his supervisors unfairly manipulated the sliding band method to advance less-qualified minority candidates over higher-qualified white candidates. They allege this occurred through use of anonymous surveys that were completed by supervisors after the promotion rankings became public and the MNPD management realized there were not enough minority candidates near the top of the lists.[4] The plaintiffs further contend that they were not aware that the anonymous surveys would be considered in the promotion process because such surveys are not mentioned in the promotion policy and their use was not included in the posted announcements for promotion vacancies. Deputy Chief Anderson

_____

[4]Chief Serpas testified that his decision to conduct anonymous surveys was made during the same time period that CWH produced the new promotion policy. (Docket No. 169-1, Serpas Depo. at 74-75.) For purposes of summary judgment, however, the court will take as true the testimony of Moore and Johnson that there was a delay after the eligibility rosters for the vacant lieutenant positions were announced, and during the delay Chief Serpas conducted the anonymous surveys for the lieutenant candidates. (Docket No. 191-2, Moore Aff. ¶ 6; Docket No. 191-3, Johnson Aff. ¶ 6.) The court will also take as true Holley's attestation that he did not learn of the anonymous survey for the sergeant promotions until after he completed the written examination and the assessment. (Docket No. 191-4, Holley Aff. ¶ 4.)

8

did not know whether CWH, the contractor that designed the new promotion policy, was even informed about the anonymous supervisor surveys.  (Docket No. 191-5, Anderson Depo. at 162.)

The plaintiffs further claim that the surveys are suspect because there was no need for anonymity in evaluating the candidates, the surveys were not standardized, supervisors' discriminatory animus based on race or gender could have been introduced into their rankings, the surveys were deleted and not saved for review in violation of federal statute and regulation, and, because the surveys were deleted, there is no way to know which supervisor ranked which candidate and why.  They argue that MNPD's failure to preserve the surveys and disclose the material during discovery warrants a sanction of default judgment in the plaintiffs' favor or, alternatively, the court's grant of an adverse inference that the anonymous supervisor surveys would have been helpful to the plaintiffs' case.  (Docket No. 169-4, Moore Depo. at 72-73; Docket No. 169-5, Johnson Depo. at 98.)

As support for their claim that Chief Serpas and the MNPD manipulated the surveys and relied on the impermissible factors of race and gender to make promotion decisions, the plaintiffs point to Jack Byrd's affidavit and Deputy Chief Anderson's 2003 memorandum to acting Chief Faulkner, as well as local media reports during 2006 and 2007.  In an October 10, 2006 article that appeared in *The Tennessean*, the author reported statements allegedly made by Don Aaron, spokesperson for the MNPD.[5]  The article stated:

---

[5]Chief Serpas acknowledged that it is important for him to let the community know through the media what he is doing as the head of MNPD and that the reports of his activities must be accurate.  Don Aaron has full authority to speak to the press on behalf of the MNPD.  If Aaron mis-states something, Chief Serpas has the ability to discipline and reprimand him.  (Docket No. 191-9, Serpas Depo. at 41-42, 44.)  Aaron met with Chief Serpas before he spoke to

Promoting the best candidates possible was the priority, and the chief was pleased there were diverse candidates to pick from near the top of the list, Aaron said.

"The goal of this police department is to mirror the population of the city to the greatest extent possible," Aaron said. "When presented with the opportunity to promote bright, qualified minority candidates, you always give those persons consideration."

(Docket No. 191-6 at 2.) Moore was also quoted in the article as one of the sergeants who was passed over for promotion and who questioned the lack of explanation given by MNPD management for the promotion decisions that were made.

On April 2, 2007, Johnson's complaints about the promotion policy were the focus of another article in *The Tennessean* headlined, "Officers say Metro police promotion policy unfair." (Docket No. 191-6 at 14.) The story stated, without attribution to a particular source, that Metro had changed its system for promoting police officers to increase the number of minorities in the department's upper ranks. (*Id.*) The author reported that Don Aaron allegedly stated that the need for diversity was a factor, and the article quoted Aaron as saying: "If you have two candidates who are essentially equal and believe that both would make very good supervisors, and if your choice is to make the department more diverse, you would probably elect to include diversity in your choice[.]" (*Id.*) An April 4, 2007 article on the webpage of NewsChannel5 attributed to Aaron the statement that the department's promotion policy was changed in 2006 in the hope that MNPD would become more diverse at the top. (*Id.* at 15.)

---

the media about the MNPD promotion issues, and Chief Serpas told Aaron his positions and thoughts on the subject. (*Id.* at 43.) Under these facts, the court finds that Don Aaron acted as an agent of Chief Serpas and the MNPD when he spoke to the media about the promotion issues.

During his deposition, Don Aaron could not recall the specific questions the media asked him or his specific responses, and he did not find that all of the information the media attributed to him in the news reports was accurate. (*See e.g.,* Docket No. 179-3, Aaron Depo. at 49-52.)

10

The defendants respond that the promotion policy did not preclude the use of anonymous supervisor surveys. Moreover, the survey data the plaintiffs claim are missing did not ever exist within a written record, the defendants did not fail to preserve evidence in accordance with the law and discovery rules, and the plaintiffs are not entitled to default judgment or an adverse inference.

According to the defendants, at the time the 2006 eligibility roster was produced for the first round of lieutenant promotions, Chief Serpas had been managing the MNPD less than three years, and he did not personally know many of the police officers who were seeking promotion. (Docket No. 191-9, Serpas Depo. at 85.) To decide which candidates deserved promotion, Chief Serpas considered personnel, disciplinary, and sick leave records, the officers' assignment positions, their educational and training experiences, and any citizen complaints filed against the officers. (Docket No. 169-1, Serpas Depo. at 73-74, 101.) The plaintiffs note that Chief Serpas did not keep any notes of his work, and the personnel files he reviewed disclosed the applicants' race and gender. (*Id.* at 90.)

Chief Serpas also desired input from his management staff about their impressions of the candidates' workplace reputations, but he did not want to interview all of the supervisors face-to-face about every candidate for a promotion. (*Id.* at 73-74, 76-77, 100.) To obtain this information, Chief Serpas decided to use an anonymous survey each time a round of promotions was conducted.

Chief Serpas asked Eric Cardinal, an MNPD research analyst, to design a computer program that would allow the supervisory staff to rate candidates anonymously by ranking them from 1 to 3, with 1 being the lowest and 3 being the highest. For the lieutenant promotions,

11

Chief Serpas directed that the surveys should be completed by supervisors at the rank of captain and above, and, for the sergeant promotions, he directed that the surveys should be completed by supervisors at the rank of lieutenant and above.  (Docket No. 169-1, Serpas Depo. at 78.)  He asked Cardinal to provide him with only the candidates' average scores, referred to as the final "roll ups."  (Docket Nos. 170, 187, Serpas Affs.; Docket No. 179-7, Cardinal Depo. at 8.)  Cardinal could not recall any reason why Chief Serpas thought the surveys should be anonymous, but most of the surveys MNPD conducts are anonymous.  (Docket No. 191-11, Cardinal Depo. at 8-9, 11.)  Cardinal asked Chief Serpas if anyone would need the rating information other than him, and Chief Serpas answered, "no."  (Docket No. 189-6, Cardinal Depo. at 41.)

Cardinal designed the computer program as requested.  He sent an email with an MNPD intranet link to all of the senior supervisory officers of the appropriate rank for the promotion at issue.  Although Cardinal did not keep a list of the email recipients, he sent the email to all of the appropriate supervisors whose names appeared in the computer database at that time.  Cardinal has access to a real-time list of the names of all such senior police officials.  (Docket No. 191-11, Cardinal Depo. at 11, 18, 38.)

Upon opening the email, the supervisor was directed to click on the intranet link provided, which then jumped to a log-in screen and a set of instructions for completing the survey.  (Docket No. 169-11, Cardinal Depo. at 19.)  While only the instructions for the sergeant's survey are provided in the record, (Docket No. 188-1, Ex. 1), the parties agree the instructions for the lieutenant's survey were essentially the same.

12

Entitled, "Promotion Readiness and Potential Ratings for Sergeant Candidates," the instructions revealed that the purpose of the survey was "to seek the opinions of supervisory and management personnel who have worked directly with, or otherwise have personal awareness of the skills, abilities and knowledge possessed by, candidates eligible for promotion to the rank of Sergeant as to their overall readiness and potential." (*Id.*) The supervisor was instructed to "consider the candidate's potential to lead, manage resources, and successfully perform the duties that he or she will be required to perform" as a sergeant or lieutenant. (*Id.*) The instructions further explained that the supervisors would be required to distribute "3," "2," and "1" rankings so that not all candidates could be given the highest or lowest ranking. (*Id.*)

When a supervisor entered his or her credentials at the log-in screen, the computer program checked to see if that supervisor had already completed the survey. If not, the computer program created a temporary table, or "master table," with a list of candidates for the supervisor to rate. The supervisor then rated each candidate based on the criteria discussed in the "purpose" statement of the instructions, clicked on the candidate's name, entered the rating value given in the box provided, and pressed "submit." (*Id.*) The supervisor was told to click a "remove" button next to a candidate's name if the supervisor did not know or had not worked with the candidate. When the supervisor completed the ratings, the computer program automatically added the raw rankings to the accumulating total scores for the individual candidates and increased the number of raters by one.

After all supervisors finished taking the survey, Cardinal informed Chief Serpas that he had a window of time, perhaps 24 hours, to retrieve and review the final "rollups," which showed each candidate's name, the number of raters who evaluated that candidate, and the raw

13

and average scores of the candidate.  (Docket No. 169-11, Cardinal Depo. at 15, 19, 23; Docket No. 187, Serpas Aff. ¶ 2.)  Chief Serpas reviewed the final "roll ups," and then Cardinal deleted all of the supervisors' ranking data from the temporary tables in the database.  (Docket No. 191-11, Cardinal Depo. at 27-28.)  Consistently with this process, on one occasion Cardinal sent an email to Chief Serpas stating, "I am going to delete the info." (Docket No. 191-8.)

While there were ways to save the data in the temporary tables, Chief Serpas did not ask Cardinal to save the information, and Cardinal did not design the computer program to save it. (Docket No. 191-11, Cardinal Depo. at 11, 13.)  Deputy Chief Anderson agreed that Tennessee public records law requires the MNPD to retain most of its records, and it is MNPD policy to maintain all written documentation pertaining to promotions.  He did not have any personal concerns, however, about not saving the master tables from the supervisor surveys.  (Docket No. 191-5, Anderson Depo. at 28-29, 31-32, 140-141, 143.)  Chief Serpas denied that any records laws were violated.  (Docket No. 179-4, Serpas Depo. at 81.)

During discovery, the defendants produced to the plaintiffs hard copies of the final "roll ups" that Chief Serpas reviewed for all of the lieutenant and sergeant promotions that were effective in 2006 and 2007. (Docket No. 170, Serpas Aff. ¶¶ 2-6, Exs. 1-5.)  Chief Serpas did not promote any candidate, to lieutenant or sergeant, who scored lower than a "2.0" on the supervisor surveys.  (Docket Nos. 169-12 & 169-13.)

The defendants point out that Moore scored poorly on three supervisor surveys.  On one survey, 12 supervisors rated him.  His raw score was 19, resulting in an average score of 1.58 out of 3.  On another survey, 17 supervisors rated him.  He received a raw score of 27, making his average score 1.59 out of 3.  On the final survey, 18 supervisors rated him.  His raw score was

29, resulting in an average score of 1.61. These survey scores placed Moore at the bottom, second from the bottom, and third from the bottom of the final "rollups." (Docket No. 170, Serpas Aff., Exs. 1-3; Docket No. 169, Ex. 12.) Moore concedes that he was "way down toward the bottom" on the survey scores. (Docket No. 169-4, Moore Depo. at 72.)

Like Moore, Johnson was rated by supervisors three times, and he also scored poorly each time. On one survey, 16 supervisors rated him. His raw score was 25, making his average score 1.56 out of 3. On another survey, 12 supervisors rated him. He received a raw score of 19, resulting in an average score of 1.58. On the final survey, 12 supervisors rated Johnson. His raw score was 20, resulting in an average score of 1.67. These scores placed Johnson at the bottom, second from the bottom, and fourth from the bottom of the final "rollups." (Serpas Aff., Exs. 1-3; Docket No. 169-12.)

Both Johnson and Moore claim that the surveys were inconsistent because a different number of raters scored them each time. (Moore Aff. ¶ 11; Johnson Aff. ¶12.) Moore believes that the survey results were not saved so that MNPD could state he did poorly on the surveys and promote minorities ahead of him. (Moore Aff. ¶ 9.) As support for their claim that the survey information was deleted to hide reverse discrimination on the basis of race and gender, Moore and Johnson point to Cardinal's May 8, 2007 email to Chief Serpas stating: "I am going to delete the info." (Moore Aff. ¶ 10; Johnson Aff. ¶ 11.)

The defendants argue that no inconsistency resulted from allowing various numbers of supervisors to rate the candidates because the supervisors were directed to rate candidates only if they had worked with them or if they had personal knowledge of the candidate's skills and

15

abilities.  The supervisors were not limited to rating only those candidates in their immediate chains of command.

Johnson contends that, after the first round of lieutenant promotions was announced, on January 2, 2007, Commander Nash told him at least twice during a discussion of the promotions issue "that there were diversity issues that needed to be dealt with."  (Johnson Aff. ¶ 9.)  Johnson also spoke to David Sinor in Metro HR, and Sinor implied to Johnson that race was a factor in the promotion process when he said, "We all know what happened, if you know what I mean." (*Id.*)

Moore and Johnson met individually with a panel comprised of Deputy Chiefs Anderson, Pike and Bishop to discuss why they were not promoted.  Johnson asked the panel if he could see his ratings on the supervisor surveys, and initially they told him that he could get the information.  MNPD later stated the surveys were not retrievable.  (Johnson Aff. ¶ 10.)  When Moore asked for the same data, he was told it was not possible to see the ratings because the surveys were anonymous.

Moore claims that, during his meeting, Deputy Chief Pike stressed that there was not enough diversity in the department and that this problem had existed for a while.[6]  (Moore Aff. ¶

---

[6]Moore recorded the audio of this meeting, and the defendants produced the recording in support of their summary judgment motion.  (Docket No. 199, Ex. 3.)  Moore's affidavit mis-states Deputy Chief Pike's comments.  In response to Moore's continued discussion about race, Deputy Chief Pike replied that there had been conversations in the MNPD about diversity and that the MNPD had not reflected the community for many years; however, the purpose of the promotion policy was to select the best supervisors.  Deputy Chief Pike did not "stress" that there was not enough diversity in the MNPD.  The plaintiffs cannot create a genuine issue of material fact to defeat summary judgment by attempting to contradict the best evidence, which is the audio recording itself.  *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

15, 18.)  Moore says that he was also told he had no deficiencies that made him less suitable for promotion; it was just that other candidates were more suitable.  He says the Deputy Chiefs told him that they picked candidates from the sliding band and that the selection list was theirs.[7] Moore avers that Deputy Chief Pike told him that he should look at himself to evaluate what he missed in being promoted, but Moore says he did so and believes that he would make a fine lieutenant.  Moore says the Deputy Chiefs also told him to talk to his supervisors and ask them why he would not make a good lieutenant, and if they all told him he would make a good lieutenant, they were not telling the truth.  (Moore Aff. ¶ 15.)  Moore claims he has yet to hear any specifics about why he was not promoted, yet minority candidates who scored lower than he did were promoted.  (*Id.* ¶¶ 12, 14, 15-16.)  Moore contends that he made it clear to the Deputy Chiefs that he was being discriminated against in violation of Title VII and the THRA, but no investigation was made into his complaint, nor did he receive any feedback about his complaint. (*Id.* ¶ 19.)

Johnson says that, in a similar meeting he attended, he asked the Deputy Chiefs specifically what information was considered concerning his promotion, and he requested input as to how he could be a better candidate in the future.  The panel members replied that they considered all kinds of information, but they gave him no specifics.  Johnson asked if they looked at work history, and Deputy Chief Anderson asked, "who stated that?" as if he did not even know to look at this.  (Johnson Aff. ¶ 14.)  According to Johnson, Deputy Chief Pike questioned five times during the meeting whether the promotion process was fair.  (*Id.* ¶ 15.)

---

[7]Based on this statement, the plaintiffs contend that Chief Serpas did not actually make the promotion decisions–the Deputy Chiefs did–and this explains why Chief Serpas was not able to articulate at his deposition specific reasons why the plaintiffs were not promoted.

17

Johnson avers that he told the panel that the promotion policy was based on race and gender, that it violated Title VII, and that his complaint should be investigated. His complaint, however, was not investigated. (*Id.* ¶ 16.)

The defendants contend that Holley, like Moore and Johnson, scored poorly on the supervisory surveys. He was rated twice, and each time, 33 supervisors rated him. On one rating, his raw score was 47, making his average score 1.42 out of 3. On the second rating, his raw score was 56, making his average score 1.70 out of 3. These scores placed Holley below nearly everyone on the final "rollups." (Docket No. 170, Serpas Aff., Exs. 4-5; Docket No. 169-13, Sergeant spreadsheet.) Holley acknowledges that he scored "very poorly" on the supervisor surveys. (Docket No. 169-6, Holley Depo. at 87.)

The defendants point out that a minority candidate, Jill Weaver, also was not selected for the sergeant's promotion Holley sought. Weaver, like Holley, scored poorly on the supervisor surveys. The candidates who were ranked both one above and one below Weaver were white males, and both of them were selected for promotion. Those candidates, however, scored far better on the supervisor surveys than Holley and Weaver did. (Docket No. 169-13, 169-9; Serpas Aff., Exs. 4-5.) Holley claims that Weaver was not promoted because her husband served as president of the FOP, the FOP was against most of Chief Serpas' policies, and Weaver spoke out against Chief Serpas. (*Id.* ¶¶ 12-13.)

Holley contends that the surveys are suspect because he was rated by 33 supervisors, but he has never had 33 supervisors in his direct line of command. Rather, he has been supervised by seven (7) lieutenants and three (3) commanders. (Holley Aff. ¶¶ 7, 9.)

18

Holley states that, after the first round of sergeant promotions was announced, Chief Serpas told the candidates that, if they were not selected, then it was their right to know why they were not selected, and they could schedule a meeting, but not with him. Holley met with three Deputy Chiefs, but none of them could give him any information about what he lacked to obtain a promotion. He received a piece of paper with 33 blanks on it and his name was 32 out of 33. (*Id.* ¶ 11.)

Holley asserts that he applied for a promotion at the urging of his current lieutenant, Nikki Swisher. He believes he has always done well on evaluations, he generates a high number of arrests, and he is the employee others approach for knowledge about policy or laws. Also, he was the officer usually chosen to attend community meetings, even if the meeting was not in his zone. He received several letters from committee members thanking him for his presentations.

All of the plaintiffs claim that the supervisor surveys are suspect because they were not included in the promotion policy, the surveys were deleted and not saved for review, the surveys were not standardized, and supervisors' discriminatory animus based on race or gender could have been introduced into the rankings. (Docket No. 169-4, Moore Depo. at 72-73; Docket No. 169-5, Johnson Depo. at 98.) Moore claims the result was that qualified white males were promoted behind minority candidates. (Moore Depo. at 74.)

With respect to Johnson's low survey results, Chief Serpas explained: "I thought this survey form continued to demonstrate that the people who knew him better than I did did not believe, in comparison to the others, that he might have been as successful at this time." (Docket No. 169-1, Serpas Depo. at 103, 105.) Chief Serpas did not promote Johnson because he did not think he was as ready for the promotion as other candidates. (*Id.* at 102-104.) The same was

19

true for Moore and Holley. Chief Serpas testified: "When looking at the band of candidates that are eligible to be considered for promotion under the rule, they are all considered equal. . . . And when looking at each band of candidates, I thought that there were other candidates who were more likely to be successful than Johnson, Moore or Holley." (*Id.* at 104.) Chief Serpas denied that he considered race or gender in making the promotions. (*Id.* at 105.)

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To determine whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enter., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir.

1999).  To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  "'The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].'"  *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## ANALYSIS

In cases such as this, where the plaintiffs allege intentional discrimination in public employment and bring both a statutory claim under Title VII and an equal protection claim under § 1983, the court considers the statutory claim first under the standards that govern liability under Title VII.  *Ricci v. DeStefano*, — U.S. —, 129 S.Ct. 2658, 2672 (2009); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 794 (6th Cir. 2000).  THRA claims are also analyzed under Title VII law.  *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666, 673 (6th Cir. 2008). The plaintiffs can establish a Title VII claim of race or gender discrimination by introducing direct evidence of discrimination or by proving circumstantial evidence which would support an inference of disparate treatment.  *Grizzell v. City of Columbus Division of Police*, 461 F.3d 771, 719 (6th Cir. 2006).

## A.  Direct evidence of discrimination

Direct evidence proves the existence of a fact without requiring any inferences. *Grizzell*, 461 F.3d at 719. "Direct evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* Direct evidence does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by unlawful bias based on race or gender. *See DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004). The evidence must show, not only that the employer was predisposed to discriminate on the basis of race or gender, but also that the employer acted on that predisposition. *Id.* Once a plaintiff presents direct evidence of discrimination, the burden shifts to the employer to show that it would have taken the employment action even in the absence of discrimination. *Grizzell*, 461 F.3d at 719. For the reasons that follow, the court concludes that the plaintiffs have not presented direct evidence of discrimination against them.

The plaintiffs first point to Deputy Chief Anderson's December 2003 memorandum to acting Chief Faulkner, in which he urged the Chief to promote immediately fifteen officers to the rank of sergeant before the promotion register expired in January 2004. Because he had compared the then-current promotion register to a new register under formulation, he believed the time was ripe to promote five African American candidates whose names appeared near the top of the list because similar future opportunities for promotion would likely not exist. Shortly thereafter, Chief Faulkner promoted several white and African American officers. A jury would be required to infer that Chief Faulkner agreed with Deputy Chief Anderson's reasoning and that she acted on it in promoting African Americans over Caucasians. Because such inferences are required, the memorandum does not constitute direct evidence of discrimination. *See id.* at 719.

22

Deputy Chief Anderson's statements in the memorandum, moreover, are not the same as if Chief Faulkner, the decision-maker, had made an express statement that she preferred minority candidates over white male candidates, which would qualify as direct evidence of discrimination. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). The memorandum provides no insight into Chief Faulkner's mental state at all. Additionally, the memorandum does not concern the same promotions that are at issue here, for the plaintiffs were not even on the eligibility rosters for promotion at that time. Therefore, the 2003 memorandum is not direct evidence that MNPD discriminated against these plaintiffs in 2006 or 2007.

Next, the plaintiffs rely on the 2006 statements to the media made by MNPD's spokesperson, Don Aaron, as direct evidence of discrimination. Even though Mr. Aaron acted as an agent for the MNPD and Chief Serpas when he spoke to the media, and even if his quoted statements, standing alone on a proper foundation, might be admissible in evidence as the statements of a party opponent, Fed.R.Evid. 801(d)(2); *Grizzell*, 461 F.3d at 722, the news articles in which the quotations appear are classic inadmissible hearsay, and they cannot be considered evidence for summary judgment purposes. *See Nicholson v. City of Chattanooga*, 2005 WL 2657001 at *7 (E.D. Tenn. 2005) (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005); *Packer v. City of Toledo*, 178 F.3d 1295, 1999 WL 196540 at *3 (6th Cir. 1999)). Inadmissible evidence cannot constitute direct evidence of discrimination.

The plaintiffs also rely on Commander Nash's remark to Johnson that "there were diversity issues to be dealt with" and David Sinor's remark to Johnson, "We all know what happened, if you know what I mean." Not only is Commander Nash's remark hearsay, it provides no direct evidence of anyone's intent. The plaintiffs produce no evidence that

23

Commander Nash was involved in making the promotion decisions that affected the plaintiffs, and a stray remark by a non-decisionmaker does not constitute direct evidence of discriminatory animus. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759-60 (6th Cir. 2000).

Nothing is known about Mr. Sinor's employment position, other than that he worked for Metro HR. His comment is hearsay, and the plaintiffs have not identified the context in which the remark was made or any hearsay exception that would permit admission of this statement into evidence. Even if the statement were admissible, it is not direct evidence of discrimination. The statement is vague, ambiguous, and subject to rank speculation as to its meaning. Johnson acknowledged in his affidavit that the comment only *implied* discrimination. The plaintiffs' opinions or conjecture about what the comment meant cannot support an inference of discrimination to defeat summary judgment, *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008); *Grizzell*, 461 F.3d at 724, and, if the evidence requires inferences to be drawn, it is not direct evidence.

Finally, the plaintiffs contend that direct evidence of discrimination can be found in Chief Serpas' agreement with the diversity findings included in the 2002 MGT audit report, in Jack Byrd's testimony that the MNPD and union representatives discussed diversity during negotiations to change the promotion policy in 2006, and in Deputy Chief Pike's statement during a meeting with Moore that diversity had been discussed within the MNPD. None of this amounts to direct evidence because a jury must draw an inference that discussions about diversity necessarily equated to unlawful discrimination based on race or gender against these plaintiffs when they were denied promotions. A jury could find that the MNPD managers believed it would be good practice to recruit and promote more minority candidates to the police

24

force and its higher ranks, and still determine that Chief Serpas and the MNPD did not allow

prohibited considerations of race and gender to motivate the decisions about whether to promote

these plaintiffs or other qualified candidates who happened to be minorities.  *See Plumb v.

Potter*, 212 Fed. Appx. 472, 478 (6th Cir. 2007).  Comments indicating concern about diversity in

the police force "may have the salutary effect of an announcement that a predominantly white,

male institution will conduct itself as an equal opportunity employer."  *Altizer v. City of

Roanoke*, 2003 WL 1456514 at \*4 (W.D. Va.), *aff'd* 78 Fed. Appx. 301 (4th Cir. 2003).  The

plaintiffs have not come forward with any direct evidence of discrimination against them.

## B.  Circumstantial evidence of discrimination

The court next considers whether the plaintiffs can satisfy the requirements of a

circumstantial evidence case.  In doing so, the court applies the familiar burden-shifting

framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by *Texas

Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

To set forth a *prima facie* case of discrimination based on a failure to promote, a plaintiff

must show: (1) he is a member of a protected class; (2) he applied for and was qualified for

promotion; (3) he was considered for and denied promotion; and (4) other employees of similar

qualifications who were not members of the protected class received promotions.  *Grizzell*, 461

F.3d at 719.  In a reverse discrimination case, where the plaintiff is not a member of a protected

class, the *prima facie* burden is different and more difficult.  *Briggs v. Potter*, 463 F.3d 507, 517

(6th Cir. 2006).  Under the first prong, the plaintiff must demonstrate "background

circumstances" to support the suspicion that the defendant is the unusual employer who

discriminates against the majority.  *Id.*; *Zambetti v. Cuyahogo Community College*, 314 F.3d

25

249, 255 (6th Cir. 2002). The plaintiff can satisfy the "background circumstances" requirement by showing that evidence of the defendant's unlawful consideration of race as a factor in employment decisions in the past justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely. *Zambetti*, 314 F.3d at 256. Under the fourth prong of the *prima facie* case, the plaintiff must show that the employer treated differently employees who were similarly situated, but not members of the protected group. *Id.* at 255.

If the plaintiffs establish a *prima facie* case of discrimination, the burden shifts to the defendants to proffer a legitimate, non-discriminatory reason why the plaintiffs were not chosen for promotion. *Id.* at 255-56. If that showing is made, the burden of production again shifts to the plaintiffs to demonstrate that the reason proffered by the defendants is a pretext for discrimination. *Id.* at 256. The plaintiffs can establish pretext by showing that the reason proffered by the defendants had no basis in fact, did not actually motivate the decision not to promote, or was insufficient to warrant the decision not to promote. *Grizzell*, 461 F.3d at 720. The burden of persuasion remains at all times on the plaintiffs. *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 391 (6th Cir. 2009).

### 1. The prima facie case

Indisputably, the second and third elements of the *prima facie* case are met. The plaintiffs applied for and were qualified for promotion, and they were considered for and denied promotion. At issue is whether the plaintiffs have established the necessary "background circumstances" to show that the MNPD is that unusual employer that discriminates against the majority, and whether the plaintiffs have shown they were treated differently than employees who were similarly situated but were not members of the protected class.

### a. "Background circumstances"

In evaluating whether the plaintiffs can show "background circumstances," the first consideration is that Chief Serpas, the decision-maker, is a white male, just like the plaintiffs. This fact distinguishes the instant case from *Zambetti*, 314 F.3d at 257, also a reverse discrimination case brought by a white male police officer, where the Sixth Circuit held that the "background circumstances" requirement was satisfied solely by proof that the Chief of Police was African American and consistently promoted other African American officers over white officers. A second consideration is that the majority of the promotions Chief Serpas made in 2006 and 2007 went to white male officers. This strongly suggests that Chief Serpas did not unlawfully discriminate against white males. *See Briggs*, 463 F.3d at 517.

To satisfy the "background circumstances" requirement, the plaintiffs again mention Don Aaron's comments to the media, the Anderson memorandum, the statements of Commander Nash and David Sinor, and the discussion of diversity within the MNPD and during union negotiations. In the prior section of this opinion concerning direct evidence, the court held that the statements of Mr. Aaron, Commander Nash, and Mr. Sinor are not admissible in evidence, and that there are additional reasons why the remarks of Commander Nash and Mr. Sinor cannot support the plaintiffs' position in opposition to summary judgment. The court incorporates its prior discussion here to support the conclusion that these statements do not satisfy the "background circumstances" requirement.

That MNPD representatives discussed efforts to increase diversity in the police force, without some other evidence of invidious discriminatory intent based on race or gender, does not constitute evidence that the defendants *unlawfully* considered race or gender as factors in making

27

specific employment decisions about particular promotion candidates.  *See Zambetti*, 314 F.3d at 256.  Even taking the diversity discussions as true in the way the plaintiffs present them, the discussions show, at most, that the MNPD and its managers were aware of the legal obligation to provide equal opportunity to all police officers, *see Altizer*, 2003 WL 1456514 at *4, and the discussions do not tend to show that the MNPD is the unusual employer that discriminates against the majority.

Finally, the 2003 Anderson memorandum does not satisfy the "background circumstances" requirement.  That communication from Deputy Chief Anderson to acting Chief Faulkner was nearly identical to the communication between a Deputy Chief and a Chief that took place in the similar *Grizzell* case.  There, the Deputy Chief, Thatcher, told the Chief, Jackson, that the then-current promotion list from 1999 had three African American candidates on it and the use of that list, instead of the 2001 list, presented an opportunity to diversify the rank of sergeant.  461 F.3d at 721.  There was no evidence that Jackson compared the 1999 and 2001 lists or that he knew the racial composition of the 2001 list.  Even if Jackson knew the race of all the candidates, this did not eliminate the plaintiffs' burden to provide evidence that Jackson acted on the basis of that knowledge.  *Id.*  The court said that there was no evidence on which a reasonable jury could conclude that Jackson's conduct was racially motivated.  *Id.*

Similarly here, there is no evidence that Chief Faulkner compared the two promotion registers Deputy Chief Anderson mentioned.  Even if she knew the race of all the candidates, the Anderson memo by itself does not provide evidence that Chief Faulkner unlawfully acted on the basis of race when she promoted whites and African Americans in December 2003.  *See id.*  A reasonable jury could not find that this memorandum alone proves the *unlawful* consideration of

28

race as a factor in employment decisions in the past in order to justify a present suspicion that incidents of capricious discrimination against whites because of their race may be likely. *Zambetti*, 314 F.3d at 256. For all of these reasons, the court concludes that the plaintiffs have not met the first prong of their *prima facie* case.

### b. Disparate treatment when similarly situated

As to the fourth element of the *prima facie* case, the defendants contend that the plaintiffs cannot show that they were treated differently than "employees who were similarly situated but were not members of the protected class." *Briggs*, 463 F.3d at 517. "'In order for two or more employees to be considered similarly-situated for purposes of creating an inference of disparate treatment in a [reverse discrimination] case, the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [comparator employee] who he alleges [was] treated more favorably.'" *Leadbetter v. Gilley*, 385 F.3d 683, 691(6th Cir. 2004) (quoted case omitted). The similarities between the plaintiff and the comparator employee must exist in all relevant aspects of their respective employment circumstances. *Id.* "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." *Id.* Because the plaintiffs ranked lower than 2.0 on the supervisor surveys and no candidate with a score lower than 2.0 was promoted, the defendants argue that the plaintiffs cannot show they were similarly situated to the candidates who had scores above 2.0 and were promoted.

The plaintiffs contend that they scored high enough on the written examination and assessment center to be promoted, Chief Serpas and his Deputy Chiefs could not give any concrete reasons why the plaintiffs were not promoted, and all of the evidence on which the

29

plaintiffs previously relied shows that they were treated differently than other similarly situated employees who were not members of the protected class.

The plaintiffs also contend that the defendants cannot rely on the supervisor surveys because portions of them were deleted in violation of an EEOC statute and accompanying regulation mandating the preservation of such records. The plaintiffs request at the least an evidentiary presumption in their favor that the deleted information would have been favorable to their position in this suit. While the plaintiffs provide no explanation for why they did not raise their spoliation motion before the close of discovery, as would have been the proper practice, the court will nonetheless consider the motion.

i. Plaintiffs' request for default judgment or a presumption

A federal district court has inherent power to exercise broad discretion in imposing sanctions based on spoliated evidence. *Adkins v. Wolever*, 554 F.3d 650, 653 (6th Cir. 2009) (*en banc*). "Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003). If the district court determines that spoliation did take place, the court may consider whether the spoliation occurred due to negligence or whether the responsible party was motivated by bad faith. *O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 588 (6th Cir. 2009). Any adverse inference to be drawn must be based on the spoliator's mental state. *Joostberns v. UPS, Inc.*, 166 Fed. Appx. 783, 797 (6th Cir. 2006). Because failures to produce relevant evidence fall along a continuum of fault from innocence through negligence to intent in bad faith, the severity of a sanction should correspond to a party's fault, depending on the

30

circumstances of the case. *Adkins*, 554 F.3d at 652-653. Any sanction for spoliation of evidence should be punitive, yet fair. *Id.* at 652.

At least one district court in Tennessee has held that a party seeking a sanction for spoliation of evidence must satisfy three criteria: (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the party seeking the adverse inference must show that the records were destroyed with a culpable state of mind; and (3) the party seeking the adverse inference must establish that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *DeBakker v. Hanger Prosthetics & Orthotics East, Inc.*, No. 3:08-CV-11, 2009 WL 5031319 at *2 (E.D. Tenn. Dec. 14, 2009).

The court first considers whether the MNPD had an obligation to preserve those portions of the anonymous supervisor surveys that were deleted. The plaintiffs note that 42 U.S.C. § 2000(e)-8(c) mandates every employer and employment agency "shall (1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the [EEOC] shall prescribe by regulation or order[.]" An employer who finds this statute to impose an undue hardship may apply to the EEOC for an exemption, and if that is denied, the employer may file suit in federal court. 42 U.S.C. § 2000(e)-8. The plaintiffs allege that the MNPD did not apply for such an exemption.

Further, the plaintiffs point to 29 C.F.R. § 1602.31, which provides in pertinent part:

Any personnel or employment record made or kept by a political jurisdiction (including but not necessarily limited to . . . records having to do with . . . promotion . . .) shall be preserved by the political jurisdiction for a period of 2 years from the date of the making of the record or the personnel action involved,

whichever occurs later. . . . Where a charge of discrimination has been filed . . . against a political jurisdiction under title VII, . . . the respondent political jurisdiction shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action. . . . The term "personnel record relevant to the charge," for example, would include personnel or employment records relating to the person claiming to be aggrieved and to all other employees holding positions similar to that held or sought by the person claiming to be aggrieved; and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the person claiming to be aggrieved applied and was rejected.

The plaintiffs suggest that the Supreme Court construed these provisions in *EEOC v. Shell Oil Co.*, 466 U.S. 54, 77-78 (1984), but the Court did not mention § 2000(e)-8(c) or § 1602.31 in that opinion. Rather, the Court construed 42 U.S.C. § 2000e-5(b), a notice statute, to determine what material the EEOC must include in a charge and notice of discrimination issued to an employer before the EEOC can obtain judicial enforcement of an administrative subpoena requiring the employer to produce records to the EEOC. *Id.* at 61. Thus, *Shell Oil Co.* did not address a similar factual situation or the same law argued here, and the case is inapposite.

Applying the plain language of the statute and the regulation, this court concludes that the names of the supervisors who conducted the anonymous rankings, the lists of the candidates who were rated, and the raw rating data entered by the supervisors into the master tables of the computer program designed by Eric Cardinal constituted records that were "made" by the MNPD, even if such records were created only temporarily within a computer database by a computer program. Cardinal admitted that the deleted information could have been saved and preserved either electronically or in hard copy, as records relating to the promotions, but he did not write the program to save the information because Chief Serpas told him there was no need to do so. Under § 2000(e)-8(c) and § 1602.31, such information should have been preserved for

32

a period of 2 years after the records were made. To hold otherwise would invite all kinds of mischief aimed at skirting the statute and regulation.

The defendants rely on *Rummery v. Illinois Bell Tele. Co.*, 250 F.3d 553, 558 (7th Cir. 2001), where the court observed that employers are not required to keep every single piece of paper that employees create during an employment process. Rather, employers must retain only the actual employment record itself, not the rough drafts or processes which may lead up to it. *Id.* Because the final "rollups" were saved and produced during discovery, the defendants argue they complied with *Rummery* and nothing more was required.

While it does not appear that the Sixth Circuit has addressed this precise question, several courts, including the Seventh Circuit that decided *Rummery*, have held that the failure to preserve evidence in violation of a regulation requiring its retention can give rise to an inference of spoliation, even if litigation involving the records is not reasonably foreseeable at the time the records are made. *See e.g. Byrnie v. Town of Crowmwell Bd. of Educ.*, 243 F.3d 93, 109-10 (2nd Cir. 2001); *Latimore v. Citibank Fed. Savs. Bank*, 151 F.3d 712, 716 (7th Cir. 1998); *Favors v. Fisher*, 13 F.3d 1235, 1239 (8th Cir. 1994); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987). Having considered the reasoning of these cases, the court concludes, under the facts of this case, that the MNPD, the party having control over the survey data, had an obligation to preserve all parts of the surveys as records relating to promotion.

Next, the plaintiffs must show that the records were destroyed with a culpable state of mind. There appears to be a split in circuit court authority concerning the *mens rea* required to obtain an adverse inference stemming from the violation of the EEOC record retention regulations. *Keaton v. Cobb County*, 545 F.Supp.2d 1275, 1307 n.22 (N.D. Ga. 2007) (and cases

33

cited therein).  Some circuits require "bad conduct" by the defendant, while others require only a showing that the documents were intentionally destroyed.  *Id.*  While again there does not appear to be a Sixth Circuit case on point, in another context, the Sixth Circuit has generally directed district courts to consider how the facts of the case apply to a continuum of fault ranging from innocence to bad faith.  *Adkins*, 554 F.3d at 652-653.

Without question, the lost information was intentionally deleted at Chief Serpas' direction, after Cardinal asked if the information should be saved or if anyone else would need to see it.  This was not an accidental or negligent deletion of information.  The plaintiffs speculate that Chief Serpas acted in bad faith, but that is only their opinion, and they produce no evidence of bad faith.  Chief Serpas testified without contradiction that he reviewed only the final "rollups," and that he did not have access to the supervisors' names, the lists of candidates rated, or any of the raw data entered into the deleted master tables.  Considering that Chief Serpas himself did not have access to, or rely on, the deleted information about which the plaintiffs complain, and considering that the plaintiffs produced no evidence of Chief Serpas' bad faith, the court declines to find that Chief Serpas acted with a culpable state of mind when he told Cardinal that the information could be deleted.

Finally, the plaintiffs must show that the destroyed evidence was relevant to their claim of reverse discrimination such that a reasonable trier of fact could find that the evidence would support the claim.  They cannot do this.  The plaintiffs themselves argue only that race or gender "could have" been introduced into the ratings.  This is speculative and unsupported by evidence. Even if all of the information had been saved, there still would be no record of the mental processes of the numerous supervisors as they made their rankings.  In *Webb v. District of*

34

*Columbia*, 146 F.3d 964, 974 n.20 (D.C. Cir. 1998), it was "conceivable, although unlikely, that the destroyed documents contained marginal notes and the like that reflected discriminatory intent." In this case, the supervisors simply entered numerical ratings into temporary tables; they did not enter any information about their decision-making process that could possibly help the plaintiffs prove discriminatory animus. Through conjecture and belief, the plaintiffs cast suspicion on the supervisors' motives, but they produce no concrete evidence to suggest that a single supervisor relied on the prohibited factors of race or gender, let alone that a multitude of them did so sufficient to call into doubt all of the rankings. The plaintiffs know who the supervisors are in their chains of command, but the record is devoid of any testimony by MNPD supervisors that one or more of them relied on race or gender in making the rankings, or any testimony that Chief Serpas or his Deputy Chiefs orally instructed the supervisors to consider race and gender in making their rankings.

Furthermore, the ratings each plaintiff received in the surveys were fairly consistent over time. Such consistency suggests the supervisors' assessments of the plaintiffs' qualifications remained relatively constant, and there is even less reason to believe that the deleted information would have revealed the influence of an extraneous factor like race or gender discrimination.

Most importantly, even if the court assumes that one or more supervisors unlawfully relied on race or gender when ranking the candidates, there is no evidence that the final decision-maker, Chief Serpas, *knew* that the supervisors inappropriately relied on race or gender. Based on all of the above, the court concludes that the plaintiffs have not carried their burden to show that they are entitled to an adverse inference in their favor, let alone default judgment.

ii. The remaining evidence of disparate treatment

35

Without an evidentiary presumption in the plaintiffs' favor, all that remains to meet the fourth prong of the *prima facie* case are plaintiffs' arguments that they were qualified for promotion, that no one gave them any specific reasons why they were not promoted, and that all of the evidence previously discussed shows they were treated differently than other candidates. None of this advances the case. All candidates on the eligibility rosters were equally qualified for promotion. Not knowing why a promotion was lost does not help to explain how a plaintiff was treated differently from a similarly situated candidate. And none of the other evidence exhaustively explored previously helps to define the differences between the plaintiffs' qualifications, and those of the other candidates.

The court concludes that the plaintiffs have not met their *prima facie* burden under the *McDonnell Douglas/Burdine* framework. Even assuming the *prima facie* case is met, the court would conclude, in any event, that the plaintiffs cannot show that the defendants' conduct was a pretext for discrimination.

### 2. *The defendants' legitimate, non-discriminatory reason*

The MNPD and Chief Serpas articulated a legitimate, non-discriminatory reason for not promoting these plaintiffs in 2006 and 2007. Having considered a wide range of information such as personnel, disciplinary, and sick leave records, the officers' training and experience, the officers' assignment positions, citizen complaints, and the results of the supervisor surveys, Chief Serpas and his Deputy Chiefs determined that these plaintiffs were not ready for promotion to a higher rank, while other candidates were.

Employers are generally free to choose among qualified candidates for promotion, and the law does not require them to make perfect decisions or forbid them from making decisions

with which others may disagree.  *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 626 (6th Cir.

2006).  What matters is the employer's perception of the applicants' qualifications, and the

federal courts afford great flexibility to employers when selecting management personnel.

*Browning v. Department of the Army*, 436 F.3d 692, 698 (6th Cir. 2006).  So long as its reasons

are not discriminatory, an employer is free to choose among qualified candidates.  *Wrenn v.

Gould*, 808 F.2d 493, 502 (6th Cir. 1987).  Because the defendants articulated a legitimate, non-

discriminatory reason for their conduct, the burden shifts to the plaintiffs to show the proffered

reason is a pretext for intentional discrimination.

> *3. Pretext*

A rejected applicant must show that a reasonable jury could find that the actual reasons

offered by the defendant were a mere pretext for unlawful race or gender discrimination, not that

other reasonable decision-makers might have promoted them.  *See Bender*, 455 F.3d at 626.  The

plaintiffs must establish that Chief Serpas' promotion decisions were so lacking in merit as to

call into question their genuineness.  *Id.* at 625.  They must show that the proffered reasons had

no basis in fact, did not actually motivate the decision, or were insufficient to warrant the

decision not to promote.  *Grizzell*, 461 F.3d at 720.

Although the plaintiffs claim that they produced ample evidence of pretext–including the

2003 Anderson memorandum, the statements of Mr. Aaron, Commander Nash, and Mr. Sinor,

the diversity discussions acknowledged by Jack Byrd and Deputy Chief Pike, the anonymous

supervisor surveys, the failure of Chief Serpas to keep notes when he reviewed files, the failure

of management to give specific reasons for their promotion decisions, the failure of MNPD

management to investigate the plaintiffs' complaints of discrimination, and the superiority of the

plaintiffs' qualifications–the court concludes that the effort falls short.  For reasons already

discussed, most of this evidence is inadmissible or insufficient to generate material issues of fact

for trial on intentional discrimination based on race or gender.

The plaintiffs do not identify any policy, rule, law, or regulation that imposed a duty on

Chief Serpas to make notes while he was reviewing the employment history of promotion

candidates.  Any negative inference that could be drawn from the lack of notes would spring

from pure speculation and could not defeat the summary judgment motion.  *Arendale*, 519 F.3d

at 605; *Grizzell*, 461 F.3d at 724.

Whether qualifications evidence is sufficient to raise a question of fact as to pretext

depends on whether the plaintiff presents other evidence of discrimination.  *Bender*, 455 F.3d at

626.  If the plaintiff provides other probative evidence of discrimination, that evidence, taken

together with evidence that the plaintiff was as qualified or better qualified than the successful

applicant, might well result in the claims surviving summary judgment.  *Id.* at 626-27.  If there is

little or no other probative evidence of discrimination, to survive summary judgment, the

plaintiff's qualifications must be so significantly better than the successful applicant's

qualifications that no reasonable employer would have chosen the latter over the former.  *Id.* at

627.  To state it another way, evidence that the plaintiff was as qualified or marginally more

qualified than the successful candidate is not sufficient, in and of itself, to raise a genuine issue

of material fact on pretext.  *Id.*  When qualifications evidence is all or nearly all that a plaintiff

proffers to show pretext, the evidence must be of sufficient significance itself to call into

question the honesty of the employer's explanation.  *Id.*   "A laxer standard would move [the]

court from its proper role of preventing unlawful employment practices to the illegitimate role of

acting as a 'super personnel department,' overseeing and second guessing employers' business decisions." *Id.* (quoted case omitted).

The simple fact that the plaintiffs achieved composite scores on the written examination and the assessment center high enough to warrant promotion does not advance their assertion of pretext. All candidates whose names were placed on the eligibility rosters were deemed equally qualified for promotion. The plaintiffs provide very little to no information about their own qualifications to serve in a higher rank, and they provide absolutely no information about the qualifications of the promoted candidates to show that the plaintiffs' qualifications far exceeded those of the candidates who were promoted. Without sufficient evidence of comparative qualifications, combined with sufficient evidence of discrimination, the plaintiffs cannot show pretext.

Finally, the plaintiffs' suggestion that their discrimination complaints were not investigated when they complained to Deputy Chiefs Anderson, Pike and Bishop is not enough to avoid summary judgment. In light of all the court has said previously, the plaintiffs' assertion, even if true, is no more than a scintilla of evidence that is wholly insufficient to create a genuine issue of material fact for trial on the issue of pretext. *See Shah*, 338 F.3d at 566.

In light of the above, the court need not resolve whether the THRA provides a basis for individual aiding and abetting liability against Chief Serpas. In any event, the plaintiffs' THRA claim against him would fail for the same reasons the Title VII and § 1983 claims fail.

## CONCLUSION

For all of the reasons stated, the plaintiffs' motion for default judgment or, in the alternative, for an evidentiary presumption in their favor will be denied. The motions for

summary judgment filed by Metro and Chief Serpas will be granted, and this case will be dismissed with prejudice.

ALETA A. TRAUGER
United States District Judge